# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# 5:04CV171-H

| | |
|---|---|
| KENNETH BARTON and SHARON BARTON, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | )     **MEMORANDUM AND ORDER** ) |
| VICKI INGLEDUE, M.D., MARK SCOTT, P.A., and ASHE MEMORIAL HOSPITAL, | ) ) ) ) |
| Defendants. | ) ) |

**THIS MATTER** is before the Court on the Defendant Vicki Ingledue, M.D.'s "Motion to Dismiss and Memorandum of Law ... " (document #20) filed May 13, 2005; and the Plaintiffs' "Response ... " (document #22) filed May 31, 2005. On June 7, 2005, the Defendant filed her "Reply ..." (document #23).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this motion is now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> Defendant Ingledue's motion, as discussed below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is a medical malpractice action filed in federal court pursuant to diversity subject matter jurisdiction. The Defendant Ashe Memorial Hospital ("the Hospital") is organized under the laws of North Carolina and located in Jefferson, Ashe County, North Carolina. Defendant Mark Scott,

a North Carolina citizen, is a Physician's Assistant ("P.A.") employed by the Hospital. Defendant Vicki Ingledue, M.D., also a North Carolina citizen, is a board-certified family practice physician, who at the times relevant to the Complaint, practiced at the Hospital and served, on a rotational basis with the Hospital's other physicians, as the "on call" doctor for the Hospital's emergency room.

The Plaintiffs, Kenneth Barton and his wife, Sharon Barton, are citizens of Catasauqua, Pennsylvania. Sometime on June 24, 2001, the Plaintiffs, who apparently were in the area on vacation, went to the Hospital's emergency room for treatment of a cut on the back of Mr. Barton's lower leg that he had sustained in a fall while hiking. Although the parties have not submitted Mr. Barton's medical records, based on the narration of Mr. Scott's treatment note that is contained in the opinion of Dr. Ronald F. Sing, the Plaintiffs' expert, discussed below, the wound was "very complex ... [and] involved multiple layers into the fat, fascia, and muscle as well as being grossly contaminated." Exhibit F to Defendant's "Motion to Dismiss" (document #20).

It is undisputed that at the time Mr. Barton went to the Hospital, Dr. Ingledue was the on call doctor for the emergency room, although she was at her home during the time that Mr. Barton received treatment, and that Mr. Scott, who was under her supervision, treated Mr. Barton.

According to Dr. Sing's recitation of the care provided, which the Defendants have not disputed at this point of the proceedings, Mr. Scott administered a local anesthetic, cleaned the wound, that is, he performed a "local syringe irrigation" and "removed multiple foreign bodies," sutured the wound, applied a dressing, and gave the Plaintiff a prescription for Keflex, an antibiotic, with instructions to begin taking the medicine "if signs of infection ar[o]se." Id.

Sometime later, Dr. Ingledue reviewed and "signed off" on Mr. Scott's treatment note. In her affidavit, Dr. Ingledue states that she signed the treatment note "pursuant to the [H]ospital

procedure for post-visit physician oversight of medical care provided by physician's assistants." Exhibit A to Defendant's "Motion to Dismiss" (document #20).

The Plaintiffs allege that during the next week and as a proximate result of the Defendants' failure to provide proper medical care, Mr. Barton developed a "tremendous infection, leading to the necessity of skin grafts and substantial loss of muscle in the area of the wound from a necrotic process." Id. The Plaintiffs also allege that when Mrs. Barton contacted the Hospital telephonically and described the onset of the infection, Hospital staff instructed her that Mr. Barton would not be seen until he experienced fever exceeding 102 degrees.

The Plaintiffs subsequently returned to their home in Pennsylvania, where Mr. Barton was treated at Leigh County Hospital.

On October 30, 2001, Mr. Sacchetta wrote the Defendant Hospital and requested a copy of the Plaintiff's medical chart, which sometime thereafter he received.

On March 1, 2003, Mr. Sacchetta first contacted Dr. Sing, who is a board-certified general surgeon presently specializing in trauma and critical care at Carolinas Medical Center, Charlotte, North Carolina, to seek his opinion of the care provided by the Defendants to Mr. Barton.

The Plaintiffs do not dispute that their state law claims were subject to a three-year statute of limitations. On June 23, 2004, one day prior to the expiration of the limitations period, the Plaintiffs, through their then-local counsel, Gregory J. Brewer of Wilkesboro, North Carolina, filed a "Motion to Extend Statute of Limitations N.C. R. Civ. P. 9(j)" in Ashe County Superior Court. In the motion, Mr. Brewer stated that he had been recently retained, a fact that the Defendants do not dispute, and that he desired an extension in order "to comply with Rule 9" and to have time to obtain "all medical records from all medical providers, forward them to [Dr. Sing] for additional review

3

and receive a response." Exhibit D to Defendant's "Motion to Dismiss" (document #20). In their Response, the Plaintiffs credibly represent that at that time, they had not yet received Mr. Barton's complete medical chart from Leigh County Hospital.

Based on this showing, Superior Court Judge Michael E. Helms concluded that "good cause exist[ed] for granting the [Plaintiffs'] motion and that the ends of justice w[ould] be served by an extension" and extended the statute of limitations to October 22, 2004. Id.

On October 22, 2004, the Plaintiffs filed their Complaint, alleging negligence claims against each of the Defendants, as well as claims against the Hospital under theories of vicarious liability, agency, and "corporate liability," along with Mrs. Barton's claim for loss of consortium. In their Complaint, the Plaintiffs also stated, as they were required to do pursuant N.C. R. Civ. P. 9(j), that "the medical care of the Defendants has been reviewed by a person reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care." Document #1 at 15.

On January 15, 2005, Dr. Ingledue served "Interrogatories to the Plaintiff[s] ... Pursuant to Rule 9(j)," that is, preliminary interrogatories concerning Dr. Sing's opinion generally..

Relevant to the subject Motion to Dismiss, Interrogatory Five asked, "[d]o you believe that [Dr.] Ingledue violated the acceptable standards of care in this matter?" to which Dr. Sing responded "Yes." Exhibits E and F to Defendant's "Motion to Dismiss" (document #20).

Interrogatory Six asked Dr. Sing to "state in detail what your opinion is with respect to how Defendant ... Ingledue ... allegedly violated the standard(s) of care." Exhibit E to Defendant's "Motion to Dismiss" (document #20).

4

In response, Dr. Sing identified numerous alleged violations of the standard of care by Dr. Ingledue, including "a physician extender ... manag[ing] this [type of] wound without physician input"; cleaning the wound only through local irrigation, as opposed to placing the patient under general anesthesia and conducting a manual search for or taking an X-Ray of the wound area in order to locate any additional "foreign bodies" in the wound; immediately closing the wound, as opposed to leaving the wound open for "more irrigations over several days"; failing to install a drain in the wound once it had been closed; failure to give Mr. Barton a tetanus booster shot; failure to instruct Mr. Barton to begin taking antibiotics immediately; placing the burden of identifying infection on the patient, particularly in a wound on the back of the leg that is difficult to see; and failure to instruct Mr. Barton to follow up with a doctor within 48-72 hours of discharge from the emergency room. See Exhibit F to Defendant's "Motion to Dismiss" (document #20).

Dr. Sing also stated that in the year preceding the Defendants' treatment of Mr. Barton, he had spent 100% of his professional time in active clinical practice in the area of trauma wound management.

On May 13, 2005, Defendant Ingledue filed her Motion to Dismiss. Generally and although she cites no authority in support of this component of her motion, Dr. Ingledue moves to dismiss pursuant to Fed. R. Civ. P. 12 (b)(6), contending that the Plaintiffs cannot maintain a negligence claim against her because she did not treat Mr. Barton directly. Additionally, Dr. Ingledue contends that the Plaintiffs failed to comply with N.C. R. Civ. P. 9(j), specifically, that Judge Helms improperly extended the statute of limitations; that Dr. Sing would not qualify as an expert concerning the care provided by either a family practitioner or an emergency room physician; and that even should he qualify as an expert regarding Dr. Ingledue, Dr. Sing never opined that he

believes that Dr. Ingledue violated an applicable standard of care.

The Defendant's motion has been fully briefed as set forth above and is now ripe for disposition.

## II. DISCUSSION

### A. Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

"A motion to dismiss under [Fed. R. Civ. P. 12(b)(6)] tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1990), citing 5A C. Wright & A. Miller, Fed. Practice and Procedure §1356 (1990).

"A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of [the subject] claim." McNair v. Lend Lease Trucks, Inc., 95 F.3d 325, 328 (4th Cir. 1996) (en banc), citing Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989); and Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir. 1969). Accord Republican Party of NC, 980 F.2d at 952 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief") (internal citation omitted).

In considering a Rule 12(b)(6) motion, the complaint must be construed in the light most favorable to the plaintiff, assuming its factual allegations to be true. See, e.g., Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); Martin Marietta v. Int'l Tel. Satellite, 991 F.2d 94,

6

97 (4th Cir. 1992); and Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989).

In North Carolina, medical malpractice plaintiffs are required to establish, through the use of expert testimony, the following elements: "(1) the standard of care; (2) breach of the standard of care; (3) proximate causation; and (4) damages." Clark v. Perry, 114 N.C.App. 297, 304, 442 S.E.2d 57, 61 (1994). Accord Bailey v. Jones, 112 N.C.App. 380, 387, 435 S.E.2d 787, 790 (1993).

As noted above, Defendant Ingledue has not cited any authority in support of her contention that her role as the "on call" physician responsible for overseeing Mr. Scott and her subsequent signing off on the care he provided to Mr. Barton is insufficient to support the Plaintiffs' negligence claim against her. Indeed, the question of whether a doctor may be held liable in a medical malpractice action for failing to oversee properly the care rendered by a physician's assistant in an "on call" context appears to be one of first impression in North Carolina.

It is well settled, however, that physician's assistants may work only under the supervision and authority of a doctor. Accord Evans v. Cowan, 132 N.C.App. 1, 2, 510 S.E.2d 170, 172 (1999) (noting that "physician extenders ... [such as] physician assistants [are] attached to a physician's medical license"); and Lenzer v. Flaherty, 106 N.C.App. 496, 512, 418 S.E.2d 276, 286 (1992).

Additionally, in dicta, the North Carolina Supreme Court has recognized that medical malpractice plaintiffs might bring claims against doctors for failure to supervise their subordinate physician's assistants. Accord Henry v. Deen, 310 N.C. 75, 79-80, 310 S.E.2d 326, 330 (1984) (holding that due to expiration of statute of limitations, trial court properly denied plaintiff's motion to amend complaint, but acknowledging that plaintiff otherwise sought to amend complaint to state claim against doctor for failure to supervise properly his physician's assistant).

Finally, in cases with facts analogous to the allegations at issue herein, that is, concerning

doctors' alleged failure to properly supervise resident doctors who were not yet approved to practice in a particular speciality without supervision, the North Carolina Supreme Court has held that the supervising doctor can be held liable regardless of whether he personally treated the plaintiff. Accord Rouse v. Pitt County Memorial Hosp., Inc., 343 N.C. 186, 192, 470 S.E.2d 44, 47 (1996); and Mozingo v. Pitt Co. Mem. Hosp., 331 N.C. 182, 189, 415 S.E.2d 341, 345 (1992) ("in the increasingly complex modern delivery of health care, a physician who undertakes to provide on-call supervision of residents actually treating a patient may be held accountable to that patient, if the physician negligently supervises those residents and such negligent supervision proximately causes the patient's injuries").

In Mozingo, 331 N.C. at 191, 415 S.E. 2d at 346, the North Carolina Supreme Court held that a showing that the supervising doctor had not "call[ed] in and periodically checked on the status of the patients being treated by the residents" was sufficient to survive the defendant's motion for summary judgment, even though the evidence also showed that the doctor left his home and went to the hospital "immediately" after receiving the first telephone call from a resident concerning the plaintiff's condition.

Applying these legal principles to the record in this case, clearly, at this point in the proceedings, the Plaintiffs have alleged facts sufficient to state a negligence claim against Dr. Ingledue, and her Rule 12(b)(6) Motion to Dismiss must be denied. Notwithstanding Dr. Ingledue's essential contention that Mr. Scott acted alone in deciding not to call her and that her only involvement was in "post-treatment review," North Carolina courts clearly place a higher duty on supervising doctors who are "on call." Accord Rouse, 343 N.C. at 192, 470 S.E.2d at 47; and Mozingo, 331 N.C. at 191, 415 S.E.2d at 346 (showing that supervising doctor had not "call[ed] in

8

and periodically checked on the status of the patients being treated by the residents" sufficient to survive defendant's motion for summary judgment, even though evidence also showed doctor left his home and went to the hospital "immediately" after receiving telephone call from resident). Moreover, Dr. Sing stated that a physician's assistant's treatment of the type of wound that Mr. Barton suffered without seeking input from a doctor violated the standard of care and, as discussed in Section II.B. below, he expressly attributed this violation, at least in part, to Dr. Ingledue.

Additionally, accepting the allegations of the Complaint as true, a jury reasonably could conclude that after reviewing the treatment note, Dr. Ingledue was negligent in not directing Mr. Scott or other Hospital staff to contact Mr. Barton and direct him to begin taking the Keflex and to return to the Hospital or otherwise see a doctor immediately. For these reasons, Dr. Ingledue's Rule 12(b)(6) Motion to Dismiss will be <u>denied</u>.

### B. <u>Motion to Dismiss Pursuant to N.C. R. Civ. P. 9(j)</u>

In the second component of her Motion to Dismiss, Dr. Ingledue contends that assuming <u>arguendo</u> that the Plaintiffs have alleged facts sufficient to state a negligence claim against her, they failed to comply with Rule 9(j)'s pre-filing expert certification requirement.

In North Carolina, prior to filing a civil action for medical malpractice, the plaintiff is required to have the medical care reviewed by a medical expert pursuant to Rule 9(j) of the North Carolina Rules of Civil Procedure. See <u>Frazier v. Angel Med. Ctr.</u>, 308 F. Supp.2d 671, 676 (W.D.N.C. 2004) (N.C. R. Civ. P. 9(j) is substantive element of state law claim for medical malpractice even when brought in federal court).

When ruling on a motion to dismiss for failure to satisfy the pre-filing requirements of Rule

9(j), the "court must consider the facts relevant to Rule 9(j) and apply the law to them. Thus, a plaintiff's compliance with Rule 9(j) requirements clearly presents a question of law to be decided by a court." Phillips v. A Triangle Women's Health Clinic, 155 N.C. App. 372, 376, 573 S.E.2d 600, 603 (2002).

Rule 9(j)(1) states that a complaint alleging malpractice by a healthcare provider shall be dismissed unless:

> [t]he pleading specifically asserts that the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care.

In order for a propounded expert to testify regarding the standard of care applicable, the expert must have devoted a majority of his or her professional time during the year before the date of treatment "[i]n the active clinical practice of the same specialty as the party against whom the testimony is being offered or a similar specialty <u>that includes within the specialty the performance of the treatment at issue</u>; or [t]o the instruction of students in an accredited health professional school or clinical research program in the same specialty [as the defendant]." N.C. R. Evid. 702(b) (emphasis added). Accord Sweatt v. Wong, 145 N.C.App. 33, 38, 549 S.E.2d 222, 225 (2001) (notwithstanding that they practiced in different specialities, an emergency room doctor could testify against general surgeons because all performed the type of care at issue: "diagnosing patients with post-abdominal surgery complications such as infections").

Rule 9(j) also provides that:

> [u]pon motion by the complainant prior to the expiration of the applicable statute of limitations, a resident judge of the superior court ... may allow a motion to extend the statute of limitations for a period not to exceed 120 days to file a complaint in a medical malpractice action in order to comply with this Rule, upon a determination

> that good cause exists for the granting of the motion and that the ends of justice would be served by an extension.

A review of North Carolina precedent reveals that the standard for establishing good cause for a Rule 9(j) extension is not onerous. Accord Thigpen v. Ngo, 355 N.C. 198, 199, 558 S.E.2d 162, 163-64 (2002) (extension properly granted where plaintiff stated in her motion only that she "need[ed] additional time to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure"); and Stewart v. Southeastern Regional Medical Center, 142 N.C.App. 456, 458, 543 S.E.2d 517, 518 (2001) (extension of statute of limitations valid as to every defendant in subsequently filed lawsuit, even those not named in plaintiff's petition for extension).

Applying these legal principles, the Plaintiffs have met their burden under Rule 9(j). Indeed, they timely applied for and received an extension of the three-year statute of limitations, and prior to the expiration of the extended deadline, filed their Complaint which included the requisite Rule 9(j) certification concerning a medical expert. Although Defendant Ingledue alleges that the extension was improvidently given, that is, that the Plaintiffs were not entitled to an extension in order to obtain medical records from Leigh County Hospital and submit them to Dr. Sing for "an additional review," the record is clear that the Plaintiffs stated that they were seeking an extension "in order to comply with" Rule 9(j), a certification that has been held to be sufficient without further elaboration. Thigpen, 355 N.C. at 199, 558 S.E.2d at 163-64.

Although they were permitted to submit preliminary Interrogatories pursuant to Rule 9(j), the Defendants did not elect to probe Dr. Sing's rationale for reviewing the entire medical record prior to rendering his formal opinion. Moreover, even if Dr. Sing *could* have given an opinion concerning the medical care at issue herein after reviewing only Mr. Barton's records from the

11

Defendant Hospital, Dr. Ingledue has not cited, and the undersigned is unaware of, any authority requiring him to limit his review to those records. To the contrary, obtaining an expert's review of the entire medical record prior to filing suit certainly is within the spirit of Rule 9(j), that is, taking extra pains to fully develop the basis for medical malpractice actions prior to filing suit.

Similarly, it is apparent that Dr. Sing is qualified to give expert testimony concerning the care rendered to Mr. Barton in the Defendant Hospital's emergency room. In other words, although he practices in a different speciality than Defendant Ingledue, Dr. Sing may testify against her because he specializes in the type of care at issue, that is, the treatment of complex wounds that result from trauma. Accord N.C. R. Evid. 702(b); and Sweatt, 145 N.C.App. at 38, 549 S.E.2d at 225 (emergency room doctor could testify against general surgeons because they all performed the type of care at issue).

Finally concerning Rule 9(j), in response to Defendant Ingledue's Interrogatories, Dr. Sing clearly stated that he believes that she violated an applicable standard of care, answering "Yes" in response to a direct question on that point. Then in responding to a follow-up Interrogatory that asked how Dr. Ingledue had violated applicable standards of care, Dr. Sing identified numerous deficiencies, including permitting a physician's assistant to treat the type of wound suffered by Mr. Barton without seeking input from a doctor, which supports the inference that Dr. Sing took into account Dr. Ingledue's role as supervisor, rather than having provided care to Mr. Barton directly.

In other words, although Defendant Ingledue will, no doubt, attribute Mr. Barton's course of treatment to Mr. Scott's failure to call her, Dr. Sing placed at least some of the responsibility on Dr. Ingledue, a conclusion consistent with North Carolina case law, discussed above in Section II.A., concerning a doctor's obligations to supervise subordinates. Accord Rouse, 343 N.C. at 192, 470

S.E.2d at 47; and Mozingo, 331 N.C. at 191, 415 S.E.2d at 346 (showing that supervising doctor had not "call[ed] in and periodically checked on the status of the patients being treated by the residents" sufficient to survive defendant's motion for summary judgment, even though evidence also showed doctor left his home and went to the hospital "immediately" after receiving telephone call from resident).

Moreover, as noted above, Dr. Sing also essentially found that Dr. Ingledue was negligent when she reviewed Mr. Scott's treatment note but failed to direct Mr. Scott or other Hospital staff to contact Mr. Barton with directions to see a doctor and to begin taking the Keflex immediately.

Accordingly, because the Plaintiffs timely filed a medical malpractice Complaint that contained a proper expert certification, the Defendant's Motion to Dismiss pursuant to N.C. R. Civ. P. 9(j) must be denied.

### III. ORDER

**NOW THEREFORE, IT IS ORDERED:**

1. Defendant Vicki Ingledue's "Motion to Dismiss" (document #20) is **DENIED**.

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED**.

**Signed: June 14, 2005**

*[signature: Carl Horn, III]*

Carl Horn, III
United States Magistrate Judge