# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# 5:04CV171-H

| | |
|---|---|
| KENNETH BARTON and SHARON BARTON, ) ) ) | |
| Plaintiffs, ) ) | |
| vs. ) ) | **MEMORANDUM AND ORDER** |
| VICKI INGLEDUE, M.D., MARK SCOTT, P.A., and ASHE MEMORIAL HOSPITAL, ) ) ) ) | |
| Defendants. ) ) | |

**THIS MATTER** is before the Court on the following motions and memoranda:

1. Defendants Mark Scott, P.A. and Ashe Memorial Hospital's "Motion for Summary Judgment ..." (document #52) and "Brief in Support [with attached exhibits]" (document #53), both filed May 1, 2006;

2. Defendant Vicki Ingledue, M.D.'s "Motion for Summary Judgment [with supporting brief and exhibits]" (document #54) filed May 1, 2006;

3. Plaintiff's "Response[s] [with attached exhibits]" (documents ## 57 and 58), both filed May 18, 2006;

4. Defendants Scott and Ashe Memorial Hospital's "Reply ..." (document #61) filed June 2, 2006; and

5. Defendant Ingledue's "Reply ..." (document #62) filed June 13, 2006.

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these Motions are now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendants' Motions for Summary Judgment, as discussed below.

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

This is a medical malpractice action filed in federal court pursuant to diversity subject matter jurisdiction. The Defendant Ashe Memorial Hospital ("the Hospital") is organized under the laws of North Carolina and located in Jefferson, Ashe County, North Carolina. Defendant Mark Scott, a North Carolina citizen, is a Physician's Assistant ("P.A.") employed by the Hospital. Defendant Vicki Ingledue, M.D., also a North Carolina citizen, is a board-certified family practice physician. At the times relevant to the Complaint, Dr. Ingledue practiced at the Hospital and served, on a rotational basis with the Hospital's other physicians, as the "on call doctor" for "unassigned patients" treated at the Hospital's emergency room, that is, patients not already under the care of another physician.

The Plaintiffs, Kenneth Barton and his wife, Sharon Barton, are citizens of Catasauqua, Pennsylvania. Sometime on June 24, 2001, the Plaintiffs, who were in the area on vacation, went to the Hospital's emergency room for treatment of a cut on the back of Mr. Barton's lower leg that he had sustained in a fall while hiking. Based on the narration of Mr. Scott's treatment note in the opinion of Dr. Ronald F. Sing, the Plaintiffs' expert, the wound was "very complex ... [and] involved multiple layers into the fat, fascia, and muscle as well as being grossly contaminated."

Although Dr. Ingledue was the "on call doctor" for Mr. Barton, Mr. Scott treated Mr. Barton without calling or otherwise consulting with Dr. Ingledue.

According to Dr. Sing's description of the care provided, which the Defendants have not disputed at this point of the proceedings, Mr. Scott administered a local anesthetic, cleaned the

wound by performing a "local syringe irrigation" and "remov[ing] multiple foreign bodies," sutured the wound, applied a dressing, and gave the Plaintiff a prescription for Keflex, an antibiotic, with instructions to begin taking the medicine "if signs of infection ar[o]se."

It is undisputed that Dr. Ingledue reviewed and "signed off" on Mr. Scott's treatment of Mr. Barton's wound, although the parties dispute the timing of her review. In an earlier affidavit, Dr. Ingledue stated that she signed the treatment note "pursuant to the [H]ospital procedure for post-visit physician oversight of medical care provided by physician's assistants," but testified in her deposition that she did not date her signature or otherwise record the date of her review because there was no written Hospital policy requiring her to do so. Dr. Ingledue further testified that she could not remember when she reviewed Mr. Barton's medical chart, but that she understood that the Hospital's policy required treatment rendered by the Hospital's physician's assistants to be reviewed "as soon as possible," although on some occasions she had done so only once per month. Mr. Scott testified more specifically that although he did not know when Dr. Ingledue reviewed the Barton treatment note, his supervising physicians usually reviewed his treatment notes "within the next day or two" after the date of treatment.

The Plaintiffs testified that on July 7, 2001, and while they were still in North Carolina vacationing, Mr. Barton developed an infection, which ultimately lead to the necessity of skin grafts and substantial loss of muscle in the area of the wound.

On July 8, 2001, the Plaintiffs returned to their home in Pennsylvania, where Mr. Barton was treated at Leigh County Hospital.

On March 1, 2003, Plaintiff's counsel contacted Dr. Sing, who is a board-certified general surgeon presently specializing in trauma and critical care at Carolinas Medical Center, Charlotte,

North Carolina, to seek his opinion of the care provided by the Defendants to Mr. Barton.

On October 22, 2004, the Plaintiffs filed their Complaint, alleging negligence claims against each of the Defendants, as well as claims against the Hospital under theories of vicarious liability, agency, and "corporate liability," along with Mrs. Barton's claim for loss of consortium.[1]

In their Complaint, the Plaintiffs also stated, as required by N.C. R. Civ. P. 9(j), that "the medical care of the Defendants has been reviewed by a person reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care."

On January 15, 2005, Dr. Ingledue served "Interrogatories to the Plaintiff[s] ... Pursuant to Rule 9(j)," that is, preliminary interrogatories concerning Dr. Sing's opinion generally.[2]

In response to Dr. Ingledue's Rule 9(j) Interrogatories, Dr. Sing identified what in his expert opinion were numerous violations of the standard of care, including "a physician extender ... manag[ing] this [type of] wound without physician input"; cleaning the wound only through local irrigation, as opposed to placing the patient under general anesthesia and conducting a manual search for or taking an X-Ray of the wound area in order to locate any additional "foreign bodies" in the wound; immediately closing the wound, as opposed to leaving the wound open for "more irrigations over several days"; failing to install a drain in the wound once it had been closed; failure to give Mr. Barton a tetanus booster shot; failure to instruct Mr. Barton to begin taking antibiotics immediately; placing the burden of identifying infection on the patient, particularly in a wound on

---

[1] As discussed below, the subject Motions for Summary Judgment are directed against the Plaintiffs' negligence claims and do not discuss their derivative claims.

[2] There is no indication in the record that Mr. Scott or the Hospital served any Rule 9(j) Interrogatories.

4

the back of the leg that is difficult to see; and failure to instruct Mr. Barton to follow up with a doctor within 48-72 hours of discharge from the emergency room.

Dr. Sing also stated in response to the Rule 9(j) Interrogatories that in the year preceding the Defendants' treatment of Mr. Barton, he had spent 100% of his professional time in active clinical practice in the area of trauma wound management.

On May 13, 2005, Dr. Ingledue filed a Motion to Dismiss contending, among other things, that the Plaintiffs could not maintain a negligence claim against her because she did not treat Mr. Barton directly and that Dr. Sing would not qualify as an expert concerning the care provided by the Defendants.

On June 14, 2005, the undersigned denied Dr. Ingledue's Motion to Dismiss, concluding that "a jury reasonably could conclude that after reviewing the treatment note, Dr. Ingledue was negligent in not directing Mr. Scott or other Hospital staff to contact Mr. Barton and direct him to begin taking the Keflex and to return to the Hospital or otherwise see a doctor immediately." See "Memorandum and Order" at 9 (document #24). Regarding Dr. Sing's standing as an expert qualified to give an opinion concerning treatment rendered by the Defendants, the Court held that "although he practices in a different speciality than [the Defendants], Dr. Sing may testify against [them] because he specializes in the type of care at issue, that is, the treatment of complex wounds that result from trauma." Id. at 12, citing N.C. R. Evid. 702(b) (for propounded expert to testify regarding the standard of care applicable, he must have devoted a majority of professional time during the year before the date of treatment "[i]n the active clinical practice of the same specialty as the party against whom the testimony is being offered or a similar specialty that includes within the specialty the performance of the treatment at issue"); and Sweatt v. Wong, 145 N.C.App. 33,

38, 549 S.E.2d 222, 225 (2001) (notwithstanding practice in different specialities, emergency room doctor could testify against general surgeons because all "diagnos[ed] patients with post-abdominal surgery complications such as infections").

In his subsequent deposition, Dr. Sing testified that when presented with a complicated wound like that suffered by Mr. Barton, the standard of care at a "midlevel" facility such as the Defendant Hospital would be either to perform an initial irrigation (cleaning) of the wound and leave it open for further cleaning or to refer the patient to a more advanced facility where a surgical cleaning could be performed. Therefore, in Dr. Sing's opinion, Mr. Scott violated the standard of care when he performed a simple syringe irrigation and then sutured a complex and highly contaminated wound that was extremely susceptible to infection.

Dr. Sing further stated that while he does not find fault with Dr. Ingledue's "on call" arrangement with the Hospital per se, once Dr. Ingledue reviewed Mr. Scott's treatment note, in his expert opinion, she violated the standard of care by not contacting Mr. Barton and directing him to immediately seek further, appropriate treatment.

Because the record does not reflect exactly when Dr. Ingledue reviewed the treatment note, Dr. Sing discussed causation in only general terms. Dr. Sing opined that if Dr. Ingledue had contacted Mr. Barton prior to the onset of infection on July 7, 2001, "it would ... have made [a] difference" in the course of the infection, but that if she had not contacted Mr. Barton until sometime after he had returned to Pennsylvania on July 8, 2001, the "call[] ... would not have made any difference ... [because] "the infection would have [already] been in play" and Mr. Barton was by then seeking treatment at Leigh County Hospital.

As the Defendants point out in their Motions and briefs, Dr. Sing has never visited the Defendant Hospital and at the time of his deposition had no personal knowledge of the demographic conditions or financial status of the Defendant Hospital or Ashe County generally. It is undisputed, however, that Dr. Sing has practiced medicine in North Carolina since 1995, and taking the record in the light most favorable to the Plaintiffs that many of his patients in the interim came from facilities in outlying areas such as Ashe County.

On May 1, 2006, Mr. Scott and the Hospital filed their "Motion for Summary Judgment" (document #52), which is confined to renewing the previously-addressed objection to Dr. Sing's qualifications to render expert testimony in this case, that is, to the Defendant's argument that Dr. Sing based his opinion on a standard of care applicable to "midlevel providers" rather than a standard of care derived from personal familiarity with the specific demographic and financial conditions facing the Defendant Hospital; that he practices a different medical specialty than the Defendants; and that he normally treats complicated wounds surgically rather than with the syringe irrigation procedure that Mr. Scott performed on Mr. Barton.

Dr. Ingledue also filed her "Motion for Summary Judgment" (document #54) on May 1, 2006 rearguing similar challenges to Dr. Sing's status as an expert, but also contending that because Dr. Sing is unable to definitely state that Dr. Ingledue reviewed Mr. Scott's treatment note prior to the onset of Mr. Barton's infection, the Plaintiffs have failed to establish that her alleged negligence was the proximate cause of Mr. Barton's injuries.

Along with their Responses, the Plaintiffs have submitted an Affidavit from Dr. Sing in which he states that he has now reviewed demographic and financial data concerning the Defendant Hospital and Ashe County and that his opinions remain unchanged.

The Defendants' Motions have been briefed as set forth above and are now ripe for disposition.

## II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

### B. Medical Expert Testimony

In North Carolina, medical malpractice plaintiffs are required to establish, through expert testimony and otherwise, the following elements: "(1) the standard of care; (2) breach of the standard of care; (3) proximate causation; and (4) damages." Clark v. Perry, 114 N.C.App. 297, 304, 442 S.E.2d 57, 61 (1994). Accord Bailey v. Jones, 112 N.C.App. 380, 387, 435 S.E.2d 787, 790 (1993).

In order for a propounded expert to testify regarding the standard of care, the expert must have devoted a majority of his or her professional time during the year before the date of treatment "[i]n the active clinical practice of the same specialty as the party against whom the testimony is being offered or a similar specialty that includes within the specialty the performance of the treatment at issue; or [t]o the instruction of students in an accredited health professional school or clinical research program in the same specialty [as the defendant]." N.C. R. Evid. 702(b) (emphasis added). Accord Sweatt, 145 N.C.App. at 38, 549 S.E.2d at 225 (notwithstanding practice in different specialities, emergency room doctor could testify against general surgeons because all performed the type of care at issue: "diagnosing patients with post-abdominal surgery complications such as infections").

Moreover, "[t]o establish the relevant standard of care for a medical malpractice action, an expert witness must demonstrate that he is familiar with the standard of care in the community where the injury occurred, or the standard of care of similar communities." Billings v. Rosenstein, ___N.C. App. ___, ___, 619 S.E. 2d 922, 923 (October 18, 2005) (reversing summary judgment entered in favor of defendant doctor), rev. denied, ___ N.C. ___, ___ S.E. 2d. ___ (March 8, 2006) (emphasis added). In Billings, the plaintiff's propounded expert was a professor at Johns Hopkins University School of Medicine, who was licensed to practice medicine in North Carolina, but had

9

not done so in more than 15 years, and who "had never been to ... and had no personal knowledge of" the Wilkes County, North Carolina hospital where the defendant practiced. ___ N.C. App. at ___, 619 S.E. 2d at 923-24. Nevertheless, the North Carolina Court of Appeals concluded that the expert <u>was</u> qualified to testify concerning the applicable standard of care at the defendant hospital, primarily because he had treated patients transferred from "outlying areas similar to" Wilkes County during a brief period more than fifteen years earlier when he had practiced in Fayetteville, North Carolina. <u>Id.</u>

      Applying these legal principles and taking the evidence, as we must at this point in the proceedings, in the light most favorable to the Plaintiffs, their expert, Dr. Sing, may offer his opinions defining the standard of care and the Defendants' alleged breach of that standard. As the Court concluded previously (upon consideration of Dr. Ingledue's first Motion to Dismiss), although Dr. Sing practices in a different medical speciality than the individual Defendants, he may testify against them because he specializes in the type of care at issue, that is, the treatment of complex wounds that result from trauma. <u>Accord</u> N.C. R. Evid. 702(b); <u>and</u> <u>Sweatt</u>, 145 N.C.App. at 38, 549 S.E.2d at 225.

    The Defendants' present contention that Dr. Sing should be disqualified because he rarely performs a syringe irrigation misses the point. Indeed, the issues as presented in the Complaint and by Dr. Sing's testimony are not whether Mr. Scott performed the syringe irrigation properly, but whether relying solely upon a syringe irrigation was appropriate in the first instance; and whether upon learning that the complex, infection-prone wound had been treated in that fashion, Dr. Ingledue breached the standard of care by failing to follow up with Mr. Barton.

Similarly, although Dr. Sing was not familiar on the date of his deposition with the specific demographic and financial constraints confronting the Defendants in Ashe County, at the time Mr. Barton sought medical care from the Defendants, Dr. Sing had been treating complicated trauma wounds in North Carolina for the preceding six years at a regional facility where patients from surrounding communities similar to Ashe County were routinely transferred. In other words, in the light most favorable to the Plaintiffs, Dr. Sing was familiar with the standard of care at "midlevel facilities" similar to the Defendant Hospital, and consequently, the jury should be permitted to consider his opinion on that subject. Accord Billings, ___ N.C. App. at ___, 619 S.E. 2d at 923-24.

### C. Causation

As noted above, in order to survive a motion for summary judgment, a medical malpractice plaintiff must establish not only a breach of the applicable standard of care, but also that the alleged breach was the proximate cause of his damages. Accord Clark, 114 N.C.App. at 304, 442 S.E.2d at 61; and Bailey, 112 N.C.App. at 387, 435 S.E.2d at 790.

In North Carolina, proximate cause is a cause "which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed." Williamson v. Liptzin, 141 N.C.App. 1, 10-11, 539 S.E.2d 313, 319-20 (2000), citing Hairston v. Alexander Tank & Equipment Co., 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984).

Along with foreseeability, important considerations in evaluating proximate causation include:

> whether the cause is, in the usual judgment of mankind, likely to produce the result; whether the relationship between cause and effect is too attenuated; whether there is a direct connection without intervening causes; whether the cause was a substantial factor in bringing about the result; and whether there was a natural and continuous sequence between the cause and the result.

Id., citing Wyatt v. Gilmore, 57 N.C.App. 57, 59, 290 S.E.2d 790, 791 (1982).

It is well settled, however that "[t]here may be more than one proximate cause of an injury." Davis v. North Carolina Dept. of Human Resources, 121 N.C.App. 105, 115, 465 S.E.2d 2, 6-7 (1995).

In North Carolina "it is only in exceptional cases, in which reasonable minds cannot differ ... that a court should decide proximate cause as a matter of law." Williams v. Carolina Power & Light Co., 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979). Accord Boudreau v. Baughman, 322 N.C. 331, 346, 368 S.E.2d 849, 860 (1988) (ordinarily, proximate causation is a jury question).

Applying these legal principles to the facts in this case taken in the light most favorable to the Plaintiffs, there is an issue of material fact as to causation sufficient for them to avoid summary judgment. A reasonable jury could accept Dr. Sing's testimony and conclude that applying a single, de minimis cleaning to a complex contaminated wound was unlikely to prevent the onset of infection and, therefore, that the failure to treat the wound properly was both "likely to produce" and a "substantial factor in bringing about the [injurious] result." Williamson, 141 N.C.App. at 10-11, 539 S.E.2d at 319-20. Moreover, "in the usual judgment of mankind," failure to properly clean and otherwise treat properly a contaminated, high risk wound is likely to result in infection. Id. Finally,

12

there is no indication in the record of any intervening cause that would prevent a jury from finding a direct connection between the alleged negligence and the result.

Dr. Ingledue's argument to the contrary notwithstanding, there is also evidence that taken in the light most favorable to the Plaintiffs would permit the jury to conclude that she reviewed Mr. Barton's medical record nearly two weeks before the onset of the infection and, therefore, that her alleged negligence in failing to contact Mr. Barton was a proximate cause of his resulting injuries. Although Dr. Ingledue did not record the date of her review and testified that she could not recall when she reviewed the note and that sometimes she only reviewed medical records once per month, she admitted that she was then aware that Hospital policy required her to sign off on physician's assistants' treatment notes "as soon as possible." Moreover, as previously noted, Mr. Scott testified that Hospital physicians typically reviewed his treatment notes within "the next day or two" and the Defendants have offered nothing to show that the preparation and review of Mr. Barton's medical record was in any way delayed or otherwise atypical.

In short, where the timing is indefinite only because of Dr. Ingledue's failure to date her review, and there is no indication that Hospital practice and custom were not followed in this instance, the Plaintiff has raised an issue of material fact both as to whether Dr. Ingledue reviewed Mr. Barton's medical record well in advance of the onset of infection and as to whether her subsequent failure to follow up with Mr. Barton was a proximate cause of his injuries.

## III. ORDER

**NOW THEREFORE, IT IS ORDERED:**

1. Defendants Mark Scott, P.A. and Ashe Memorial Hospital's "Motion for Summary Judgment ..." (document #52) and Defendant Vicki Ingledue, M.D.'s "Motion for Summary Judgment" (document #54) are **DENIED**.

2. The Clerk is directed to place this matter on the calendar for trial during the Court's November 13, 2006 Civil Jury Term.

3. Counsel for the parties are encouraged to explore settlement in light of the Court's rulings herein, and to consider whether returning to the previously-ordered mediation might be advisable. Provided, however, counsel are advised that the Court intends to try this case during its November Term and therefore any efforts to settle their differences in the interim should be promptly commenced.

4. The Clerk is further directed to send copies of this Memorandum and Order to counsel for the parties; and to Gary S. Hemric (previously appointed to mediate this case, which mediation to date has resulted in impasse).

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: July 5, 2006

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge